Filed 6/8/26  In re Jesse B. CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

|  |  |
|---|---|
| In re JESSE B., a Person Coming Under the Juvenile Court Law. | C104927 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br>        Plaintiff and Respondent,<br><br>v.<br><br>C.B.,<br>        Defendant and Appellant. | (Super. Ct. No. STK-JD-DP-2023-0000252) |

Mother appeals the juvenile court's orders terminating her parental rights and freeing the minor Jesse B. (Jesse) for adoption (Welf. & Inst. Code, § 366.26; statutory section citations that follow are to the Welfare and Institutions Code.)  She contends the juvenile court erred in: (1) denying her request to change Jesse's placement; (2) terminating her parental rights despite her request to apply the beneficial parent-child relationship exception to the preference for adoption; and (3) failing inquire as to possible Apache heritage in violation of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et. seq.).  We issued an order for supplemental briefing asking the parties to address whether substantial evidence supported the juvenile court's ICWA determination in light of the failure of the San Joaquin Human Services Agency (Agency) to provide additional information to the Cherokee Nation as requested by that tribe.  Having reviewed that

1

briefing, we now conditionally reverse the matter and remand for the limited purpose of compliance with the ICWA. We otherwise affirm the trial court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

The Case Initiation and Reunification Proceedings

In July 2023, a mandated reporter contacted the Agency because of mother's threats to drown, murder, and/or throw newborn Jesse (26 days old) against a wall. Jesse's 12-year-old brother A.W. took him to another room to keep him safe, and an officer placed mother on a section 5150 hold given her two prior strike convictions. Jesse's father, J.B., was soon to be released from prison and controlled mother and A.W.'s behavior. A protective custody warrant issued, and the paternal grandmother, A.B., expressed an interest in taking custody of the children. In the interim, A.W. tried to run away from the emergency shelter with Jesse, and as a result, they had to be placed separately.

The initial dependency petition alleged Jesse and A.W. were dependents according to section 300 subdivisions (b), (g), and (j). Mother failed to appear for the initial detention hearing, the children were detained, and supervised visits with mother authorized. Mother had her first supervised visit on July 24, 2023. Thereafter, mother's visits vacillated between in-person and virtual between August 2023 and November 2023. Jesse was placed with the paternal grandmother in October 2023.

In November 2023, mother submitted on jurisdiction and disposition, the children were adjudged dependents, and mother granted reunification services. The Agency's second amended dependency petition filed a few weeks thereafter continued to allege the children were dependents pursuant to section 300 subdivisions (b), (g), and (j). From November 2023 to March 2024, mother's visits vacillated between in-person and virtual due to physical incidents with father and mother's prioritization of her delivery job. Mother had seven visits canceled for not showing, arriving beyond the grace period, and

2

for failing to confirm her visits as directed during this timeframe. She also missed one April visit and one May visit. Leading up to the July 2024 status hearing, mother missed five consecutive weekly visits. Despite this, the juvenile court approved additional reunification services, adding domestic violence services and admonishing mother to make her visits. The court also approved findings and orders that stated, "the parents have consistently and regularly contacted and visited with the children."

As of January 2025, mother had last visited Jesse in-person in September 2024. She otherwise had once weekly virtual visits. Mother missed at least one visit with Jesse in October 2024.

In February 2025, and following over 18 months of services, the juvenile court terminated mother's reunification services as to Jesse.

The Section 366.26 Briefing and Related Issues

The Agency's section 366.26 report recommended terminating mother's parental rights and freeing Jesse for adoption. The paternal grandmother had cared for Jesse since October 2023, and she was committed to providing him with a permanent home through adoption. Jesse lived with the paternal grandmother in her one-bedroom apartment. The paternal grandmother was in her 40s and worked for a rideshare company. The two lived alone, as the paternal grandmother's husband passed away from COVID-19 a few years prior. The Agency did not believe it would be detrimental to terminate mother's parental rights. The report did not analyze any exceptions to the preference for adoption.

The section 366.26 report further noted mother's virtual visits with Jesse would last approximately 15 minutes. Mother skipped at least one of her virtual visits in June due to staying up late with Jesse's brother A.W., who was on a home visit. Mother told the Agency she intended to "detach herself now" and that A.W. did not want to participate in virtual visits with Jesse anymore because he did not "feel comfortable" talking with the paternal grandmother there. Nonetheless, mother requested in-person

3

visits for herself and A.W. informing the Agency that she "does not get along with [the paternal grandmother] due to her attitude and parenting styles." The Agency tentatively arranged a supervised in-person visit for June 19, 2025.

The Agency's June 2025 status report indicated that when contacted about in-person visitation, mother refused to visit if the paternal grandmother was there. Consistent with this, mother refused to visit on Jesse's birthday even though she acknowledged it was his birthday.

The June 2025 status report also relayed mother's statement that she, father, and the paternal grandmother had agreed to a legal guardianship for Jesse, and mother opposed any adoption. The Agency informed mother Jesse's permanent plan was adoption, and the Agency was not aware of any agreement with the paternal grandmother. Jesse was thriving in his current placement and was attached to the paternal grandmother. The paternal grandmother met Jesse's needs, worked collaboratively with his providers, and was eager to adopt him. This report also did not analyze any exceptions to the preference for adoption.

The Agency filed its next status review report at the end of July 2025. This report reflected mother's complaint that she had video showing smoke being blown into Jesse's face during a virtual visit and requesting his removal from the paternal grandmother's home. Mother also complained that the paternal grandmother was unfit to care for Jesse as she had been a teen mom, met mother while they were prostitutes, introduced father while he was incarcerated, and allowed father into her home as evidenced by a screenshot of father's phone's location and pictures posted to his Instagram feed. Father was not at the paternal grandmother's home at an unannounced visit by the Agency following mother's complaint.

When asked, the paternal grandmother explained the smoke from the video was either incense or sage and denied vaping into Jesse's face. The paternal grandmother vaped, but never near Jesse. The paternal grandmother initially reported that prior to

4

meeting with the adoptions unit, father was allowed to enter the home to pick up Jesse for visits, but she later denied that he entered her home and stated that exchanges occurred outside. Father denied being in the paternal grandmother's home when Jesse was there and had been living with mother but now lived with a friend. Agency efforts to locate an alternative family placement were unsuccessful. Although the Agency intended to remove Jesse from the paternal grandmother, it continued to recommend adoption as the permanent plan given that Jesse was generally adoptable.

In August 2025, Jesse's attorney objected to his proposed removal from the paternal grandmother and requested he be left with the paternal grandmother pending a hearing and discovery. The juvenile court directed the paternal grandmother to only allow visitation as scheduled by the social worker and that there should be no smoking of any kind around Jesse. The paternal grandmother would transport Jesse to supervised visits to be scheduled by the Agency.

The Agency's October 2025 interim review report continued to recommend the termination of mother's parental rights. It also recommended Jesse's removal from the paternal grandmother and placement with another relative. The Agency conducted two unannounced visits to the paternal grandmother's home in response to mother's complaints, father was not at the home, nor were his belongings present. Nonetheless, mother and father's plan was for A.W. to be returned to mother, Jesse would be adopted by the paternal grandmother, and then the paternal grandmother would give Jesse to father. However, the paternal grandmother made clear that she did not intend to give Jesse to anyone and wanted to adopt and raise him herself. The paternal grandmother later told the Agency she had cut ties with father, did not know what the smoke was from the video, and apologized if vaping smoke drifted in from the patio, promising it would never happen again.

The Agency spoke with paternal great cousin Y.B. who was interested in caring for Jesse and had begun the approval process. Y.B. told the Agency troubling things

5

about the paternal grandmother's background (including that she has a criminal history for prostitution) and was willing to adopt Jesse. Y.B. had five adult children, the youngest of which was leaving for college, and she enjoyed helping to care for two of her grandchildren, ages three and four. Her two-bedroom home was clean and appropriate.

The Agency also spoke with two of mother's friends, E.R. and J.W., who were both willing to adopt Jesse, although one of them preferred he be adopted by a family member if possible.

Prior to the section 366.26 hearing, mother visited Jesse in a community park once weekly for two hours as supervised by the Agency from August 27, 2025, to October 10, 2025. Jesse called the paternal grandmother mom, was reluctant for her to leave, and was happy each time she came back at the end of visits. Mother would bring Jesse food, which he mostly refused to eat, and the two would play either with the park equipment or toys. Jesse enjoyed playing with mother. Sometimes Jesse would try to hit mother or have a temper tantrum when she told him no or tried to redirect his behavior. Sometimes mother changed his pullups, although Jesse occasionally resisted. At the end of the visits, Jesse would not always comply with mother's requests for kisses or for him to say, "I love you." Redirections by the paternal grandmother often resulted in Jesse complying with mother's requests.

The combined section 366.26 and placement hearing occurred in October 2025. The Agency told the juvenile court it had lost faith in the paternal grandmother and asked the court to approve its request to remove Jesse. Jesse's counsel opposed this request arguing the paternal grandmother had cared for Jesse his entire life, Jesse was bonded to the paternal grandmother, and it would be hard to move him to another placement despite concerns that the paternal grandmother might not keep the parents away. Father also opposed the request arguing the paternal grandmother had corrected the issues, and it would not be in Jesse's best interests to take him from the only parent he had ever known.

6

Mother supported Jesse's removal, arguing the paternal grandmother could not be trusted and that a paternal cousin had confirmed concerns about the paternal grandmother.

In the context of these arguments, the juvenile court identified the two primary concerns with the paternal grandmother as "the smoke" and "the father's presence," and inquired concerning father's background, how long it might take to complete an adoption, and whether the plan could be changed if it needed to be (e.g., to legal guardianship). The Agency social worker explained that mother said that the paternal grandmother previously allowed mother and father in her home, and they would leave when the Agency social worker would do announced visits. The Agency had recently conducted two unannounced visits to the paternal grandmother's home, and father was not there, nor were there any items of his in the home. The video that mother had shared with smoke being blown into Jesse's face did not show the origin of the smoke. The paternal grandmother's home was clean, with toys and food. Jesse was happy. Jesse's counsel further urged the court to consider the source of the information, that father was likely moving out of state, and that the Agency could do more unannounced visits if necessary. Ultimately, the juvenile court elected to leave Jesse placed with the paternal grandmother.

On the issue of terminating mother's parental rights, mother testified that she attended most of her visits with Jesse, which had been Zoom visits for much of the case, but had recently been in person. Mother visited with Jesse for two hours in a public park where they would play, and she would bring him food. Jesse called her "Mommy" and recognized her as his mom, which mother stated was something she had been working on. Jesse would have an attitude at the end of visits, which she assumed was because she was leaving. The two would share hugs and kisses, and Jesse would tell mother he loved her. Mother opined terminating her relationship with Jesse would be detrimental to him because she had completed all her services, was not unfit, and she had a bond with him as his birth mother. Mother believed Jesse knew and loved her and had also bonded with this brother. On cross-examination, mother conceded that prior to August 2025, she had

video visits and had attended most of them. Jesse's participation in and the duration of the video visits varied given his young age. They would practice his letters and numbers and sing songs.

The Agency argued there was clear and convincing evidence Jesse was likely to be adopted, and mother had not established regular visitation or that mother had the type of relationship with him that would justify not terminating her parental rights. Jesse's counsel agreed, arguing Jesse considered mother to be a friendly visitor, and thus, it would not be a detriment to terminate parental rights. Mother asked the juvenile court to apply the beneficial parent-child relationship exception to adoption, arguing she visited consistently, had opportunities through her illicit contact with the paternal grandmother to care for the minor, and that Jesse had a strong bond to mother as shown by his anger at the end of visits and recognition of mother as his mom.

Thereafter, the juvenile court found by clear and convincing evidence that Jesse was likely to be adopted, that it was in his best interests to have parental rights terminated, and that no exceptions to the preference for adoption applied. Accordingly, the court terminated mother's parental rights. Mother did not request, and the court did not make any explicit rulings on the elements of the beneficial parent-child relationship exception.

### The ICWA Investigation and Determination

In July 2023, mother told the Agency that the maternal great aunt, C.M., was a member of a tribe in Oklahoma, although neither mother nor the maternal grandmother knew which one or had the maternal great aunt's contact information. Mother completed a Parental Notification of Indian Status ICWA-020 form (ICWA-020 form) containing this information the same day. The same month, the maternal grandmother confirmed the family had Native American ancestry, telling the Agency they were "Cherokee Indian" and "Blackfoot Indian," but she could not identify a family member who has membership

8

or is eligible for membership in a tribe, nor could she identify the state of origin of their ancestry. The paternal grandmother denied Native American ancestry.

Another ICWA-020 form completed by mother was filed in August 2023 and indicated she was a member or eligible for membership with the "Blackfoot" or "Cherokee" tribes in Oklahoma and that maternal great aunt, C.M., was also either a member or eligible for membership with these tribes. This form listed what appeared to be a phone number for C.M.

In September 2023, the Agency filed a Notice of Custody Proceeding for Indian Child ICWA-030 form identifying four possible tribes of Blackfeet and Cherokee origin. It included the names and other biographical information for Jesse's paternal and maternal grandparents, as well as some of his maternal and paternal great grandparents. The form identified three Cherokee tribes for Jesse's maternal great grandfather, R.M. Maternal great aunt, C.M., was also identified as having Cherokee affiliation. The Agency sent this form to the three identified Cherokee tribes and the Blackfeet Tribe.

On December 6, 2023, the Agency filed the Blackfeet Tribe's letter stating Jesse was not eligible for enrollment with the Blackfeet Nation. On December 18, 2023, the Agency filed responses from the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians. Notably, the October 2023 response from the Cherokee Nation stated that Jesse might be "connected to the Cherokee Nation through the maternal great grandfather" but that the middle name and/or date of birth for the maternal great grandfather was required to make this determination. The remaining tribes indicated Jesse was not eligible for membership.

Thereafter, the Agency continued to speak with relatives and shared the paternal grandfather's supplemental information with other tribes, but the record does not reflect that the Agency ever followed up with the Cherokee Nation.

According to the Agency's October 2025 interim review report, mother requested a referral to the Native America Center in Stockton in October 2025. Mother explained

that an individual at Lilypad had told her about the Native American Center and how they assisted in researching tribal heritage. Mother initially denied knowing which tribe she might belong to. She later asked whether "Apache is a Tribe" and then stated she might be Apache. Mother wanted to become associated with a tribe so that she could receive payments from them. Mother asked about other tribes and was informed that there were over 500 federally recognized tribes. The Agency also spoke to the maternal grandmother who reported her continued efforts to identify which tribe the family might be associated with, but she had not been successful.

At the section 366.26 hearing on October 20, 2025, the juvenile court determined the Agency had completed its due diligence and that Jesse was not an Indian Child.

DISCUSSION

*I*

*The Placement Change Request*

Mother challenges the juvenile court's refusal to remove Jesse from the paternal grandmother's home arguing the court abused its discretion considering the information before it. Recognizing her reunification services had already been terminated, mother argues she nonetheless has standing to challenge this determination because she appealed the termination of her parental rights that occurred the same day, and Jesse's placement impacted that decision.

" 'Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.]' [Citation.] Thus, '[a] parent cannot raise issues on appeal which do not affect his or her own rights.' [Citations.] 'A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights.' " (*In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1459.)

10

In this case, mother seeks to challenge the juvenile court's refusal to remove Jesse from the paternal grandmother's home. She posits that had the juvenile court moved Jesse to another home, the court might have instead selected a legal guardianship as his permanent plan. Although the "placement of a dependent child with relatives can, under certain circumstances, make the termination of parental rights unnecessary" (*In re K.C.* (2011) 52 Cal.4th 231, 237), those circumstances do not exist in this case because each of the individuals identified as alternatives to the paternal grandmother's home affirmed their willingness to adopt Jesse. (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 436.) The record does not suggest, and we will not speculate, that an alternative relative caregiver would express a preference for legal guardianship. (See § 366.26, subd. (c)(1)(A) [relative caregiver exception to the termination of parental rights].)

Nor are we persuaded by mother's arguments that the juvenile court's inquiry concerning the possibility of altering the permanent plan sometime in the future to include, for example, a permanent guardianship, placed terminating her parental rights over Jesse's safety. The complained-of inquiry occurred in response to suggestions that the paternal grandmother would allow father unsanctioned visits with Jesse and reflected the court educating itself so that it could make a reasoned determination weighing the benefits to two-year-old Jesse of remaining in the only home he had ever known with the caregiver he considered his mother, versus the possibility that the paternal grandmother might ignore the court's directive to keep father away except for Agency-sanctioned visits. This does not suggest a legal guardianship was contemplated in Jesse's case. Again, all available alternative caregivers were willing to adopt Jesse, who was generally adoptable. Accordingly, this claim fails.

11

## II

### *The Termination of Mother's Parental Rights*

Mother argues the juvenile court erred in terminating her parental rights because it should have applied the beneficial parent-child relationship exception to adoption.

Legal Background

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1); *In re Z.G.* (2026) 19 Cal.5th 373.)  One such exception is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

To establish the beneficial parent-child relationship exception, the parent must show by a preponderance of the evidence three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*); see *id.* at p. 636.)  In assessing whether termination would be detrimental, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Id.* at p. 632.)  When the parent meets this burden, the exception applies such that it would not be in the child's best interest to terminate parental rights, and the court selects a permanent plan other than adoption.  (*Id.* at pp. 636-637.)

We review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard.  (*Caden C., supra*, 11 Cal.5th at

p. 641.)  The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship.  (*Id.* at pp. 639-640.)  As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even when substantial evidence to the contrary also exists.  (*Id*. at p. 640.)  The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion.  (*Ibid*.)  "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' "  (*Id.* at p. 641.)

Application

In the present case, the juvenile court ruled from the bench, stating, "The Court does find by clear and convincing evidence it is likely the child will be adopted.  It's in the child's best interest to have parental rights terminated.  Termination of parental rights is not detrimental to the minors—minor.  [¶]  None of the exceptions pursuant to Welfare and Institutions Code Section 366.26(c)(1) exist."  The court did not make any express findings on the beneficial parent-child relationship exception, and no findings were required unless the court were to apply that exception.  (§ 366.26, subd. (c)(1)(D).)

Nor has mother established that the juvenile court erred when it impliedly determined she had not offered sufficient evidence to establish the applicability of the beneficial parent-child relationship exception.  On the first element, while there is evidence that mother visited Jesse, it is questionable whether that visitation should be characterized as regular.  Over the course of the case, mother missed at least 16 of her weekly visits, at one point going over a month without having a visit of any kind, and intentionally missed Jesse's second birthday.  Nonetheless, mother engaged in more consistent weekly visitation towards the end of the case, and the record contains at least one set of findings and orders that mother visited "consistently and regularly," so there is

13

at least some evidence that the juvenile court could have used to find that mother visited consistently.

Assuming only for purposes of argument that mother provided sufficient evidence to meet the first element, there is a lack of evidence that mother established the *kind* of bond required to satisfy the second element.  There is ample evidence of mother's bond with and commitment to Jesse as she loved him very much, completed court services, and was committed to loving and protecting him.  However, that is not the pertinent inquiry.  Rather, the juvenile court was tasked with evaluating whether Jesse was bonded to mother to the extent required for the exception to apply.  (*Caden C., supra*, 11 Cal.5th at p. 632.)  While a parent-child relationship in this context need not conform to a particular pattern (*ibid.*), mother bore the burden of establishing that her relationship with Jesse rose above that of a friendly visitor in the child's eyes.  (See, e.g., *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate"].)

Here, two-year-old Jesse had not been in mother's care since he was a little over three weeks old.  The vast majority of his visits with mother had been virtual, although they had recently converted to in-person playdates at the park.  Jesse appeared to enjoy visiting mother and would play with her.  However, the record does not establish mother's relationship with Jesse rose to more than a playmate.  (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230.)  Rather, the record shows that Jesse—following a transition period wherein he was reluctant for the paternal grandmother to leave—enjoyed playing with mother, including playing with toys and the equipment at the park, as well as engaging in various games such as hide and seek.  He objected, however, to her attempts to: redirect his behaviors, feed him, and change his pull-ups.  He also did not always willingly return her overtures of love and affection.  Further, while mother had been trying to teach Jesse that she was his mom and that the paternal grandmother was "meme," Jesse continued calling the paternal grandmother mom.  Moreover, and contrary

to mother's testimony that Jesse had an attitude at the end of visits because she was leaving, the record reflects that Jesse was excited when the paternal grandmother returned and would greet her as "mom." Finally, mother's testimony acknowledged that Jesse's bond with her derived from her status as his birth mother, which in this case does not alone establish the requisite relationship.

Given the lack of evidence that mother was anything more than a friendly visitor in Jesse's eyes, we conclude that mother has not demonstrated that the trial court erred in determining she had presented insufficient evidence to establish the parental benefit exception to adoption. Accordingly, this claim fails.

*III*

*Compliance with the ICWA*

Mother complains that substantial evidence does not support the juvenile court's ICWA determination because the Agency failed to investigate mother's possible affiliation with the Apache Tribe. We issued a supplemental briefing order asking the parties to address the Agency's failure to provide the information requested by the Cherokee Nation as part of its further inquiry duties. The parties agree, as do we, that the matter must be conditionally reversed and remanded for compliance with the ICWA, specifically, for the Agency to complete its further inquiry duties vis-à-vis the Cherokee Nation.

Legal Background

The ICWA "protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings." (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an "Indian child" as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian

15

tribe." (25 U.S.C. § 1903(4).) "Under ICWA's state analogue statutes [the California Indian Child Welfare Act] (Cal-ICWA; [citation]), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child … is or may be an Indian child' in dependency cases." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*); § 224.2, subd. (a).) "Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' " (*Dezi C.*, at p. 1125, fn. omitted.)

A juvenile court's finding that the ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) The court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.)

<u>Application</u>

Here, the record reflects that on October 12, 2023, the Cherokee Nation wrote the Agency indicating that Jesse might be "connected to the Cherokee Nation through the maternal great grandfather but without a middle name and/or date of birth for [R.M.], an accurate determination of tribal enrollment eligibility cannot be made." The Agency filed this letter with the juvenile court on December 18, 2023. The Agency later obtained the requested information concerning R.M., but the record does not reflect that it was ever shared with the Cherokee Nation.

16

Accordingly, the Agency did not comply with its duty of further inquiry, and the juvenile court's determination that the Agency had exercised due diligence is not supported by substantial evidence. (*Dezi C., supra*, 16 Cal.5th at pp. 1134, 1141; *In re D.S.* (2020) 46 Cal.App.5th 1041, 1054.) In light of this determination, we must conditionally reverse the matter for further ICWA inquiry. Should mother have additional information suggesting a possible affiliation with the Apache Tribe, she may share that information with the Agency on remand, and the Agency shall document any such claim as part of its ICWA duties.

### DISPOSITION

The judgment is conditionally reversed and remanded for the limited purpose of compliance with the ICWA. If the juvenile court thereafter finds a further inquiry was proper, adequate, and duly diligent and concludes the ICWA does not apply, the judgment shall be reinstated. If, however, the court concludes the ICWA applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with the ICWA and California implementing provisions.

/s/
HULL, Acting P. J.

We concur:

/s/
RENNER, J.

/s/
BOULWARE EURIE, J.

17